# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| In re | Case No. 03-00817 |
| | Chapter 11 |
| HAWAIIAN AIRLINES, INC., | |
|     Debtor. | |
| | Adv. Pro. No. 06-90026 |
| HAWAIIAN AIRLINES, INC., | |
|     Plaintiff, | |
|   vs. | |
| MESA AIR GROUP, INC., | |
|     Defendant. | Re: Docket No. 56 |

## MEMORANDUM OF DECISION ON
## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Hawaiian Airlines, Inc. ("HA"), alleges that defendant Mesa Air

Group, Inc. ("Mesa"), obtained secrets about HA's business under a confidentiality

agreement approved in HA's chapter 11 case and used those secrets, in violation of

the confidentiality agreement, when Mesa began to compete against HA. HA

seeks a preliminary injunction restraining Mesa from selling tickets for interisland

air travel for one year. Although the evidence raises real doubts about the

propriety of Mesa's conduct, I conclude that HA has not met the stringent standard

for a preliminary injunction.  Therefore, I will DENY the motion.  HA will be free, however, to seek similar relief as part of a final judgment.

## I.    STATEMENT OF FACTS

### A.    HA's Reorganization Case and the Confidentiality Agreement

HA has provided air transportation services among the Hawaiian islands since 1929.  HA now also offers transpacific air transportation between Hawaii and points on the U.S. mainland and elsewhere.

Mesa also provides air transportation services, mostly on the U.S. mainland. It began to fly interisland routes in 2006.

HA commenced a chapter 11 reorganization case in 2003.  Shortly after the case began, a trustee was appointed.

The trustee and the official committee of unsecured creditors decided to solicit investors to recapitalize the company and fund a plan of reorganization.  The trustee contacted potentially interested parties and sent a document, which his consultants refer to as a "teaser," to a fairly large number of parties whom the trustee believed might be willing and able to fund a plan.  The teaser contained an overview of HA and the investment opportunity.  Among other things, the teaser separately stated HA's load factor and "yield" for long-haul (transpacific) and short-haul (interisland) routes.  The teaser invited interested parties to contact the

U.S. Bankruptcy Court - Hawaii   #06-90026   Dkt # 120   Filed  10/05/06   Page 2 of 27

trustee's consultants for further information.  Mesa was one of the parties that the

trustee contacted and that received the teaser.

The trustee required those parties who wished to pursue the matter to sign a

Confidentiality and Non-Disclosure Agreement.  Mesa signed such an agreement.

The confidentiality agreement states that HA would give Mesa certain

"Evaluation Material," defined as follows:

> The term "Evaluation Material" includes all information provided to
> Mesa by [HA] and its Representatives before or after the signing of
> this agreement, whether oral or written and whether in physical or
> electronic form.  It does not include information which . . . (ii) was or
> becomes generally available to the public other than as a result of a
> disclosure by Mesa or Mesa's Representatives, [or] (iii) becomes
> available to Mesa on a non-confidential basis from a source other than
> [HA], provided that such source is not known by Mesa to be bound by
> a confidentiality agreement with [HA], or otherwise prohibited from
> disclosing the information to Mesa by a contractual, legal or fiduciary
> obligation . . . .

Mesa promised to keep the Evaluation Material secret and use it for only one

purpose:

> Mesa hereby agrees that the Evaluation Material will be used solely
> for the purpose of evaluating the Transaction between [HA] and Mesa.
> Without limiting the foregoing, Mesa specifically agrees that the
> Evaluation Material shall not be used to obtain any competitive
> advantage at any time in the event a Transaction with [HA] is not
> consummated.  In addition, such information will be kept confidential
> by Mesa . . . .

The confidentiality agreement requires Mesa to destroy or return the

-3-

Evaluation Material in two circumstances. Mesa agreed to return all Evaluation

Material to HA "[w]ithin five days after being so requested by [HA]". Mesa and

HA also agreed that:

> If either party to this agreement decides not to pursue a Transaction, they will promptly notify the other party of that decision. Upon such notice, all of the Evaluation Material, including that portion of the Evaluation Material that consist of analyses, compilation, forecasts, studies, or other documents prepared by Mesa or Mesa's Representatives, will be returned to the appropriate party or destroyed immediately.

Mesa agreed that "money damages would not be a sufficient remedy for any

breach of this agreement, and that [HA] shall be entitled to specific performance

and injunctive or other equitable relief as a remedy for any such breach."

The confidentiality agreement had a two year term:

> Mesa's obligations under this agreement shall remain in effect for a period of two years from the date of disclosure with respect to any Evaluation Material, unless and until this agreement is terminated by [HA] or is superseded by another written agreement between Mesa and [HA] that concerns Mesa's use of the Evaluation Material.

HA disclosed Evaluation Material to Mesa in March and April 2004. HA

sent Mesa one or two paper copies of a document entitled "Hawaiian Airlines, Inc.

Information Memorandum" (the "HA Information Memorandum"). Later, HA sent

Mesa, in electronic form, some revised pages of the HA Information

Memorandum. Mesa printed those pages and inserted them in the paper copy (or

-4-

copies). HA also gave Mesa a password with which Mesa could gain access via the internet to an electronic "data vault" which contained more information about HA.

In order to protect HA's confidential information while still attracting investors, the trustee placed information in the data vault in stages. During the initial rounds of bidding, the data vault did not contain HA's most sensitive information. As the bidders were winnowed, the trustee added more information to the data vault. Only the last two bidders got to see the most sensitive data.

George Murnane III, Mesa's executive vice president and chief financial officer, swore that Mesa safeguarded the HA Information Memorandum in a secure filing cabinet and that only "a very few individuals with a 'need to know'" had access to it. Mr. Murnane testified initially that he did not recall making any additional copies of the Information Memorandum (although it is now clear that he, or perhaps someone else at Mesa, must have done so). Mr. Murnane also gained access to the data vault on several occasions and copied on a CD some of the documents stored there. Mr. Murnane testified that he downloaded the documents so he could review them later, but that ultimately he never looked at those documents. Mr. Murnane testified that he eventually destroyed the CD and the paper copies of the HA Information Memorandum, but he cannot recall when

U.S. Bankruptcy Court - Hawaii   #06-90026   Dkt # 120   Filed 10/05/06   Page 5 of 27

he did so.

There is a dispute about the value and usefulness of the HA Information Memorandum and the documents in the data vault that Mesa downloaded. HA's witnesses testify that the information is of great value and that HA zealously protected its secrecy. According to HA, the information it provided to Mesa amounts to a "users guide" to operating an interisland airline which a competitor could not reproduce without great effort and expense. Mesa's witnesses testify that the information was not particularly useful to a potential market entrant or competitor and that most, if not all, of it was or became available from public sources.

Mesa (with a financial partner) submitted an offer to sponsor a plan of reorganization on May 5, 2004. On May 12, 2004, the trustee and the committee told Mesa that they had not selected Mesa for the second round of bidding. Over the next few days, Mesa thought about seeking reconsideration of this decision, but Mesa soon decided not to do so.

After the bidding ended, the successful bidder, the trustee, and the committee sponsored a joint plan of reorganization for HA. The plan was accompanied by a disclosure statement, filed on September 9, 2004. The disclosure statement was distributed to many creditors and included in the court's

-6-

public file.  The disclosure statement contained information similar to (but less detailed than) that contained in the HA Information Memorandum.  Although much of the HA Information Memorandum became public in this fashion, the information in the data vault mostly remained confidential.

B. <u>Mesa's Entry into the Interisland Market</u>

Mesa claims that, in or around April 2005, Mesa began to think about acquiring or forming a business alliance with Aloha Airlines, Inc. ("AQ"), HA's principal competitor on the interisland routes, which was then in its own chapter 11 proceeding.  (Mesa claims that it had intermittently considered entering the interisland market since about 1990.)  Mesa retained GCW Consulting, an aviation consulting firm, to "look at a possible acquisition or some other structure for entry into the Hawaii market."  GCW and its president, Morris Garfinkle, also had access to HA's confidential information because GCW had provided consulting services to Hawaiian Holdings, Inc. ("Holdings"), HA's parent corporation, while Holdings was itself considering a bid to reorganize HA.  Both Holdings and GCW agreed to keep HA's information confidential.  Mesa, GCW, and Mr. Garfinkle deny that GCW or Mr. Garfinkle gave Mesa any of HA's confidential information or used any of that information for Mesa's benefit.

Mesa did not acquire or forge an alliance with AQ.  Instead, on September

-7-

23, 2005, Mesa announced to the public that it intended to form a new company, with one or more financial investors, to provide interisland air service. In order to solicit investors, Mr. Murnane and other Mesa staff members prepared a memorandum (the "Mesa Offering Memorandum") which summarized Mesa's plans and prospects. Mesa sent it to a small number of recipients.

In January 2006, Mesa's president, Jonathan Ornstein, conducted a telephone conference with prospective investors. Mr. Ornstein said that he was confident that Mesa could make a profit in the interisland market because "we do have the benefit of looking at both Aloha and Hawaii[an] when they were in bankruptcy . . . ."

In February 2006, Mesa decided to finance its new operations itself, without an outside investor. Mesa began selling tickets for interisland flights at some point between March 23 and May 30, 2006, and began interisland flight operations on June 9, 2006.

C.     Mesa's Use of HA's Information

Mesa has given conflicting accounts of its use of HA's information. Mr. Murnane initially testified (in a declaration filed with Mesa's answer to HA's complaint) that he had not even looked at any of HA's information while Mesa was considering its own entry into the interisland market:

U.S. Bankruptcy Court - Hawaii   #06-90026   Dkt # 120   Filed  10/05/06   Page 8 of 27

> Following [HA's trustee's] public announcement regarding the investor selected to assist [HA] in its restructuring, Mesa did not review or utilize in any way any of the confidential information received during Mesa's evaluation process described above in analyzing Mesa's contemplated entry into the Hawaiian inter-island air market. More specifically, Mesa did not review, consider or otherwise use [in] any manner the confidential data including (but not limited to) financial forecasts, market data, cost information, revenue information, route performance or other "crown jewels" of [HA], in Mesa's decision to begin flight operations in the Hawaii market or whether such entry would be profitable.
>
> * * *
>
> At no time was the information I obtained from the [Information] Memorandum (as amended) used in any fashion whatsoever in evaluating or considering whether Mesa would enter the Hawaiian inter-island air service market or in formulating its plan to do so.

Mr. Murnane largely confirmed this testimony in a subsequent deposition.

Later, Mr. Murnane was forced to admit that his initial testimony was incorrect in some respects. For example, HA has established and Mr. Murnane has admitted that (1) Mesa copied large chunks of text and several charts from HA's Information Memorandum and reproduced them in Mesa's Offering Memorandum, (2) Mesa used information from HA's Information Memorandum in a presentation to Mesa's board of directors, and (3) Mr. Murnane sent one of his colleagues an electronic copy of part of the HA Information Memorandum and told him that a portion of Mesa's Offering Memorandum "needs to be more like the attached." Mr. Murnane now testifies that, although he does not remember doing any of these

-9-

things, he must have done all of them.  Mr. Murnane still denies, however, that the information he copied was confidential and denies that he made any other use of HA's information.  The current record does not permit me to determine whether the contradictions in Mr. Murnane's testimony are the product of an innocent failure of memory or deliberate deception.

D.    Procedural History

HA filed this action on February 13, 2006, alleging that Mesa had breached the confidentiality agreement.  HA sought damages and an injunction restraining Mesa from providing interisland air service in Hawaii for no fewer than two years and from benefitting from the Evaluation Material in any way.  HA also sought an order requiring Mesa to turn over and account for all Evaluation Material that has been in its possession or control.

HA filed the motion for preliminary injunction on June 28, 2006.  The motion requests that Mesa be prohibited from issuing any new tickets for air travel in Hawaii for one year and that it also "be required to honor each and every ticket that it has issued to date."  The motion was argued on September 15, 2006.  No evidentiary hearing has been held.

U.S. Bankruptcy Court - Hawaii   #06-90026   Dkt # 120   Filed 10/05/06   Page 10 of 27

## II.  STANDARD FOR GRANTING A PRELIMINARY INJUNCTION

A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948 (2d ed. 1995), with emphasis added).

The basic function of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits.  Los Angeles Mem'l Coliseum Comm'n v. NFL, 634 F.2d 1197, 1200 (9th Cir. 1980).  See also Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981) ("[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held").  A preliminary injunction "may also be granted to prevent irreparable injury."  Ross-Whitney Corp. v. Smith Kline & French Laboratories, 207 F.2d 190, 199 (9th Cir. 1953).  "A preliminary injunction, of course, is not a preliminary adjudication on the merits but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment."  Sierra On-Line, Inc., v. Phoenix Software, Inc., 739 F.2d 1415, 1422 (9th Cir. 1984).

A court may issue a preliminary injunction if the moving party demonstrates either of the following combinations of factors:  (1) probable success on the merits

U.S. Bankruptcy Court - Hawaii   #06-90026   Dkt # 120   Filed  10/05/06   Page 11 of 27

and possibility of irreparable injury, or (2) there are serious questions going to the merits and the balance of hardships tips sharply in favor of the moving party. Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th Cir. 1987), citing Oakland Tribune, Inc. v. Chronicle Publishing Co., 762 F.2d 1374, 1376 (9th Cir. 1985).

These alternative tests for obtaining a preliminary injunction represent "extremes of a single continuum" rather than two separate standards. Sun Microsystems, Inc. v. Microsoft Corp., 188 F.3d 1115, 1119 (9th Cir. 1999). Accordingly, "the greater the relative hardship to the moving party, the less probability of success must be shown." Id. (Citation omitted.) As an "irreducible minimum," however, the moving party must demonstrate a "fair chance of success on the merits, or questions serious enough to require litigation." Arcamuzi, 819 F.2d at 93, citing Oakland Tribune, 762 F.2d at 1376. In addition, "[u]nder any formulation of the test, the moving party must demonstrate a significant threat of irreparable injury." Id.

The court must also consider whether the public interest favors issuance of the injunction. Southwest Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 917 (9th Cir. 2003). "[T]he less certain the [court] is of the likelihood of success on the merits, the more plaintiffs must convince the [court] that the public

U.S. Bankruptcy Court - Hawaii   #06-90026   Dkt # 120   Filed  10/05/06   Page 12 of 27

interest and balance of hardships tip in their favor."  344 F.3d at 918.

Certain "particularly disfavored" preliminary injunctions must satisfy a still more stringent standard.  The Ninth Circuit distinguishes a prohibitory injunction, which "preserves the status quo," from a mandatory injunction that "'goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored.'" A court should deny such a mandatory injunction "'unless the facts and law clearly favor the moving party.'"  Stanley v. Univ. of S. Cal., 13 F.3d 1313, 1320 (9th Cir. 1994) (citing Anderson v. United States, 612 F.2d 1112, 1114 (9th Cir. 1979)).  The injunction which HA seeks is partly prohibitory, in that it would bar Mesa from selling new tickets for interisland flights, and partly mandatory, because it would require Mesa to honor tickets which Mesa already sold.

Also disfavored are preliminary injunctions which grant the movant substantially all of the relief which the movant seeks at the final conclusion of the lawsuit.  "[I]t is not usually proper to grant the moving party the full relief to which he might be entitled if successful at the conclusion of a trial."  Tanner Motor Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 808 (9th Cir. 1963).  See also Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 35 (2nd Cir. 1995) ("[t]he bottom line is that, if a preliminary injunction will make it difficult or impossible

-13-

to render a meaningful remedy to a defendant who prevails on the merits at trial, then the plaintiff should have to meet the higher standard of substantial, or clear showing of, likelihood of success to obtain preliminary relief"); and SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1099 (10th Cir. 1991)("a preliminary injunction that awards the movant substantially all the relief he may be entitled to if he succeeds on the merits is similar to the 'Sentence first-Verdict Afterwards' type of procedure parodied in Alice in Wonderland, which is an anathema to our system of jurisprudence"). As a practical matter, the preliminary injunction which HA requests would give it all, or nearly all, of the injunctive relief which HA might get in a final judgment.

HA has not requested an evidentiary hearing and has objected to Mesa's suggestion that one must be held. HA and Mesa have each submitted numerous declarations and deposition transcripts and many pages of documentary evidence. See International Molders' and Allied Workers' Local Union No. 164 v. Nelson, 799 F.2d 547, 555 (9th Cir. 1986) (observing, but not holding, that a party might waive any right to an evidentiary hearing by failing to request one). In this circuit, trial courts have wide discretion in deciding whether to hold an evidentiary hearing on a motion for a preliminary injunction. "In our view, a preliminary injunction may be granted upon affidavits," in order to give "speedy relief from irreparable

U.S. Bankruptcy Court - Hawaii   #06-90026   Dkt # 120   Filed  10/05/06   Page 14 of 27

injury," particularly where the enjoined party is protected by a bond and "there is no dispute as to the basic facts."  Ross-Whitney Corp. v. Smith Kline & French Laboratories, 207 F.2d 190 (9th Cir. 1953).  See also Stanley v. Univ. of S. Cal., 13 F.3d 1313, 1326 (9th Cir. 1994).  But trial courts always have the authority to insist upon an evidentiary hearing if there are factual disputes.  "In deciding a motion for a preliminary injunction, the district court 'is not bound to decide . . . disputed questions of fact.'"  International Molders' and Allied Workers' Local Union No. 164 v. Nelson, 799 F.2d 547, 551 (9th Cir. 1986).


III.    DISCUSSION

    A.    Probability of Success on the Merits

    HA bears the burden of proving that Mesa breached the Confidentiality Agreement.  HA argues that Mesa breached that agreement in at least two ways: first, by misusing the Evaluation Material; and second, by failing to return or destroy the Evaluation Material as required.

        1.    *Definition of Evaluation Material*

    The first question is whether some or all of the information which Mesa obtained from HA was "Evaluation Material," as the confidentiality agreement used that term.  Mesa argues that most of the information was not Evaluation Material because it "was or [became] generally available to the public other than as

-15-

a result of a disclosure by Mesa or Mesa's Representatives." Mesa points out that all airlines must submit detailed public reports to the FAA which include extensive operating statistics, and that HA made more information public in the "teaser," the disclosure statement and other documents filed in the bankruptcy case, and SEC reports filed by Holdings.

HA first responds to this argument by arguing for a narrow interpretation of the exception to the definition of Evaluation Material. HA admits that a large quantity of information is available to any member of the public, but because the information is scattered and presented in various formats, HA claims that only an expert can gather and interpret it. HA contends that information which, as a practical matter, only an expert could find and understand is not "generally available to the public." This is not a reasonable interpretation of the plain language of the confidentiality agreement.[1] Any member of the public could gain access to much of the information which HA characterizes as Evaluation Material. Most members of the public would not know how to do so (much less be interested in doing so). But the confidentiality agreement speaks of availability to the public. Much of the allegedly confidential information was available to the public without any legal restriction, and that is all the exception requires.

_____

[1]HA does not argue that the "generally available to the public" exception is ambiguous and has not offered any evidence to support its interpretation.

-16-

HA also argues that the information which HA regards as most critical – its projections of future results of its interisland operations – were never made public. Mesa contends that the projections were in fact made public in HA's disclosure statement. Mesa is only partly correct. The publicly filed disclosure statement includes projections which closely parallel the projections found in the HA Information Memorandum. But there is one important difference.[2] The HA Information Memorandum included a paragraph which set forth some detailed assumptions upon which the revenue projections were based; the comparable paragraph in the disclosure statement contained no such details. Similarly, the data vault contained more detailed projections than the disclosure statement. Among other things, the data vault contained several sets of projections based on different assumptions, in order to test the sensitivity of the projected results to changes in the assumed conditions.

Mesa also contends that projections are inherently unreliable and are of little if any value to any other market participant. HA disagrees. The dispute is not

_____

[2]There are also differences that do not seem to reveal sensitive information and therefore are apparently not important for present purposes. For example, the projections in the HA Information Memorandum extended to 2008, while the disclosure statement projection period ends in 2007. Many of the figures in the projections are also different, but the variation is probably due to the fact that the disclosure statement was prepared several months after the HA Information Memorandum and the projections were presumably updated in the meantime.

-17-

relevant to this issue. Mesa promised to keep all of HA's secrets, including any which Mesa regards as unimportant, unreliable, or worthless. For purposes of the definition of Evaluation Material, the only question is whether the information was generally available to the public.

I therefore conclude that at least some of the information to which Mesa had access was Evaluation Material.

2. *Misuse of Evaluation Material*

HA argues that Mesa used the Evaluation Material, in violation of the confidentiality agreement, when Mesa decided to enter the interisland market. Mesa denies this allegation. HA offers various pieces of evidence in an effort to prove this contention.

The first piece of evidence on which HA relies is Mr. Ornstein's public statement that he was confident of Mesa's success because Mesa had "the benefit of looking at both [AQ] and [HA] when they were in bankruptcy . . . ." HA argues that, because Mesa looked at the HA Information Memorandum and had access to the data vault, Mr. Ornstein's statement is an admission that Mesa misused the Evaluation Material. Mesa contends, based on Mr. Ornstein's deposition testimony and the statements of other witnesses, that Mr. Ornstein was referring to the wealth of publicly available information about HA, not to any confidential

U.S. Bankruptcy Court - Hawaii   #06-90026   Dkt # 120   Filed 10/05/06   Page 18 of 27

material. HA attempts to discredit Mr. Ornstein's testimony, in part by pointing to other instances in which HA claims Mr. Ornstein was untruthful.[3] This point turns on Mr. Ornstein's credibility.

HA points out that Mesa has now admitted that it used some of the information it got from HA (for example, when Mesa cribbed portions of the HA Information Memorandum). Mesa denies that the information it used was confidential Evaluation Material. The portions of the HA Information Memorandum that Mr. Murnane now admits he lifted did not contain confidential information about HA. The pages of the HA Information Memorandum that Mr. Murnane sent to his colleague as a model for the Mesa Offering Memorandum included the critical paragraph which detailed the assumptions behind HA's projections, but HA points to no evidence that Mesa actually used those assumptions in making its own plans. Mr. Murnane's treatment of HA's information was cavalier, and his self-contradictory testimony is profoundly troubling. But Mesa's misuse of HA's nonconfidential information does not conclusively prove that Mesa also misused HA's secrets.

HA points to an email written by Mr. Garfinkle, Mesa's consultant, to Mr. Murnane. Mr. Garfinkle transmitted summary projections for Mesa's planned

---

[3] These instances of alleged untruthfulness may or may not be admissible at trial. See Fed. R. Evid. 608(b).

-19-

interisland operations with a note in which he stated that the assumed fares, load factors, and operating margins "represent the current experience in the market by [HA]." He went on to say that, "in actuality," HA's fares, load factors, and margins were higher. HA argues that the latter statement proves that Mr. Garfinkle used HA's secrets for Mesa's benefit (because, according to HA, Mr. Garfinkle could not have known HA's "actual" situation otherwise). Mr. Garfinkle has testified that HA is wrong, and that his statement was based solely on deductions he drew from publicly available information and his experience and judgment. This presents another question of witness credibility.

HA implies that, because the information which it made available to Mesa was so valuable to a potential market entrant, Mesa must have used it. The argument is sensible, but HA offers no direct evidence in support of this proposition. Mesa says that it has produced thousands of pages of documents, including its own projections and evaluations of the interisland market; HA has offered no evidence that those projections and plans were taken from (except for the nonconfidential items mentioned above) or based on HA's confidential information.[4]

---

[4]For similar reasons, Concept, Inc., v. Thermotemp, Inc., 553 So.2d 1325 (Fla. App. 1989), is inapplicable. During business negotiations, Thermotemp disclosed to Concept (under a confidentiality agreement) that Thermotemp planned to market a new machine with three specific improvements over its existing

-20-

Mesa offers the declarations of Mr. Murnane and Mr. Garfinkle in which they testify that Mesa never misused any of the Evaluation Material. As noted above, HA has successfully refuted significant portions of that testimony and has raised serious doubts about Mr. Murnane's and Mr. Garfinkle's recollection and credibility. To date, HA has not, however, directly refuted the testimony that Mesa did not use any Evaluation Material in violation of the confidentiality agreement. HA wants me to infer from the contradictions in Mr. Murnane's and Mr. Garfinkle's testimony, not only that they cannot be credited, but also that the truth is the exact opposite of everything they say. I am reluctant to draw that inference based on a written record.

Based on the existing record, and lacking the benefit of an evidentiary hearing at which I could attempt to assess the credibility of the witnesses, I am forced to conclude that HA has not demonstrated "probable success on the merits" of its claim that Mesa misused HA's secrets. HA has, however, satisfied the "irreducible minimum" requirement that there are "questions serious enough to

_____

machine. The negotiations failed, and Concept then developed and began to market a machine that competed with Thermotemp's new machine, including the three improvements. The court held that Thermotemp was entitled to a preliminary injunction halting Concept from making, marketing, or selling the copied machine. In that case, Thermotemp showed which of its ideas (particularly the three improvements) which Concept had stolen. In this case, HA has failed to identify anything from HA's secrets that Mesa incorporated in its "product."

U.S. Bankruptcy Court - Hawaii   #06-90026   Dkt # 120   Filed  10/05/06   Page 21 of 27

require litigation." Arcamuzi, 819 F.2d at 937.

          3.     *Destruction of Evaluation Material*

HA argues that Mesa also violated the confidentiality agreement by failing properly to destroy or return the Evaluation Material. As noted above, Mesa promised to destroy or return the Evaluation Material to HA within five days after HAL requested that Mesa do so or immediately after either party gave the other notice that the negotiations were terminated. HA apparently never asked Mesa to return the Evaluation Material. But HA's trustee told Mesa on May 12, 2004, that Mesa had not been selected for the second round of bidding, and Mesa had at least some of the Evaluation Material in its possession at least until October 31, 2005, when Mr. Murnane emailed a portion of the HA Information Memorandum (including the sensitive assumptions behind HA's projections) to a colleague. It is clear, therefore, that Mesa did not destroy all of the Evaluation Material to HA "immediately" after May 12, 2004, as the confidentiality agreement required.

Therefore, HA has established "probable success on the merits" of its claim that Mesa failed timely to return or destroy the Evaluation Material.

    B.    <u>Balance of Hardships</u>

          1.     *Effect of the Agreement Regarding Equitable Relief*

In the confidentiality agreement, Mesa agreed that monetary damages would

-22-

not adequately compensate HA for any breach and that HA "shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach." This provision weighs strongly in favor of granting an injunction. Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d 1256, 1266 (10th Cir. 2004). Contractual provisions are not, however, absolutely binding on courts called upon to consider equitable remedies. See, e.g., Baker's Aid v. Hussmann Foodserv. Co., 830 F.2d 13, 16 (2nd Cir. 1987) ("the contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate").

Further, the confidentiality agreement does not say what kind of injunction should be granted. Mesa persuasively argues that HA's interpretation of the equitable remedies provision would transform the confidentiality agreement into a covenant not to compete and that Mesa did not agree to such a covenant. Moreover, for a court of equity to grant an injunction, no matter how sweeping, solely on the basis that the parties previously agreed to an unspecified form of such relief would defy a long tradition recognizing that "the limited enforcement of clauses where parties have agreed to specified measures of damages is a judicial check on the freedom of contract based on public policy notions of the courts of equity." Brecher v. Laikin, 430 F. Supp. 103, 106 (S.D.N.Y. 1977), citing 5

-23-

Corbin, Contracts § 1055 (1964).

I conclude that, while the equitable remedies provision weighs in HA's favor in the balancing process, it is not conclusive.

   2. *HA's Hardship*

HA argues that, in this case, Mesa's alleged misuse of the Evaluation Material unfairly benefitted Mesa, at HA's expense, by (1) giving Mesa the idea of entering the interisland market and competing with HA, (2) giving Mesa a "users manual" to the market which allowed it to enter the market earlier and at reduced cost, and (3) limiting Mesa's risk in entering the market. Mesa has offered testimony (which HA so far has failed to rebut) that Mesa had been looking at the interisland market since about 1990, and the wide publicity of HA's financial success during the bankruptcy case probably led many market participants to consider the markets in which HA operated. Mesa has also offered substantial expert testimony (which HA has countered) that the Evaluation Material would not have been particularly useful to a prospective competitor. The dispute turns on witness credibility.

HA also contends that misappropriation of confidential information constitutes irreparable harm as a matter of law. This proposition is supported by substantial authority and common sense. Mesa's misuse of HA's confidential

-24-

information (if proven) could inflict irreparable harm on HA.

As noted above, Mesa probably breached the confidentiality agreement by failing timely to return or destroy the Evaluation Material. HA has failed, however, to identify any irreparable harm which this breach (apart from any misuse of the Evaluation Material) inflicted upon HA.

3.    *Mesa's Hardship*

HA argues that Mesa has failed to offer any evidence of any hardship it might suffer if the preliminary injunction is granted. The injunction HA proposes would deprive Mesa of all revenue from its interisland operations for a year, while requiring Mesa to continue to honor tickets it already sold. It is obvious that such an injunction would be a severe blow to any business.

C.    Public Interest

HA argues that the requested injunction is necessary to maintain the integrity of the bankruptcy bidding process and this court's orders. These are important values which must be given appropriate weight.

Mesa argues that the public interest in increasing competition in the interisland market supports denial of the injunction. HA argues convincingly that there is no assurance that all of the current participants will remain in the market[5]

---

[5]At least at one time, Mesa hoped to drive AQ out of business. Mr. Murnane stated in a declaration that "[a]t no time did Mesa base its business plan or decision

-25-

or that any fare reductions will be permanent.  It is hard to predict the future direction of a market, but greater competition usually benefits the public.

Accordingly, at this point, the public interest factor is fairly evenly balanced.

D.    Striking the Balance

In summary, HA has not established "probable success on the merits" of its claim that Mesa misused HA's secrets but has demonstrated that there are "questions serious enough to require litigation."  HA has, however, established probable success on the merits of its claim that Mesa failed timely to return or destroy the Evaluation Material.  The balance of hardships is fairly even; Mesa's misuse of HA's secrets would (if it occurred) inflict irreparable injury on HA, but the requested injunction would likely terminate Mesa's participation in the interisland markets.  Similarly, the public interests in granting and withholding the requested injunction are fairly evenly balanced.  Therefore, under the traditional

---

to enter the Hawaii inter-island market on [AQ] or [HA] exiting this market."  In his deposition, he said that Mesa had not even done any analysis to determine what would happen to Mesa's business if AQ were to cease operations.  Both statements are false.  One week before Mesa announced that it planned to enter the interisland market, Mr. Murnane wrote, in an email to Mr. Garfinkle, "I agree that if we assume AQ stays in market and in business forever, this project makes no sense. We definitely don't want to wait for them to die, rather we should be the ones who give them the last push. . . . Clearly if we can get [AQ] out of the market without anyone else stepping in this is a homerun."  Similarly, HA has proven that, contrary to Mr. Murnane's sworn testimony, Mr. Garfinkle prepared a set of projections based on the assumption that AQ would reduce its flights and go out of business.

-26-

standard, the preliminary injunction should be denied.

The scope of the requested injunction also requires special scrutiny. The injunction is partly a mandatory injunction, not just a prohibitory injunction. The preliminary injunction would also give HA the most important element of the relief which it seeks in its Complaint. These are additional factors that weigh against HA's motion.

## IV. CONCLUSION

I therefore conclude that HA has not made the showing required to justify the requested preliminary injunction. A separate order denying the motion will issue.

*/s/ Robert J. Faris*
**United States Bankruptcy Judge**
Dated: **10/05/2006**

U.S. Bankruptcy Court - Hawaii   #06-90026   Dkt # 120   Filed  10/05/06   Page 27 of 27